**The Law Office Yusuf El Ashmawy, Esq, P.C.**
11 Park Place, Suite 711, New York, New York 10007
Tel: (718) 207-5787
Email: yae.esq@gmail.com

June 12, 2023

The Honorable Nelson S. Román
United States District Court
Southern District of New York
The Hon. Charles L. Brieant Jr.
Federal Building and United States Courthouse
300 Quarropas Street
White Plains, New York 10601-4150

<u>**Re: United States of America v. Lewis 21 Cr. 789 (NSR)**</u>

Dear Judge Román:

      Title 18, United States Code Section 922 (g)(8) is a facially unconstitutional restriction on a person's right to bear arms in violation of the Second Amendment. The plain text of the Second Amendment states clearly that "a well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. II Amend. Calvin Lewis moves this Court to dismiss Count 1 of the indictment charging him with Possession of Ammunition by a Prohibited Person in violation of § 922 (g)(8). See *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), *United States v. Rahimi*, No. 21-11001 (5th Cir. 2023)[1], *District of Columbia v. Heller*, 554 U.S. 570 (2008) and *Range v. Lombardo*, No. 21-2835 (3rd Cir. 2023),

      The Supreme Court in *Bruen* held that when the "Second Amendment's plain text covers an individual's conduct" it is both presumptively protected, and the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-2130. In *Rahimi*, the Fifth Circuit vacated the conviction of an individual who pled guilty to firearms possession while the subject of a protective order, finding that § 922 (g)(8) was unconstitutional and that the statute's "ban on possession of firearms is an "outlier that our ancestors would never have accepted." *Rahimi* No. 21-11001 at 25. Mr. Rahimi raised a "facial challenge" to 18 U.S.C. § 922(g)(8) arguing that the law was unconstitutional "consider[ing] only the text of the statute itself, not its application to the particular circumstances of an individual." (quoting *Freedom Path, inc. v. Internal Revenue Serv.*, 913 F.3d 503, 508 (5th Cir. 2019). In *Range*, the Third Circuit recently found that § 922(g)(1) violated the Second Amendment and that despite a prior criminal conviction the Government failed to show "that our Republic has a longstanding history and tradition of depriving people like [the appellant] of their firearms…." *Range*, No. 21-2835 at 22.

---

[1] Following this decision, the government petitioned for an expedited Writ of Certiorari under United States v. Rahimi, No. 22-915.

Mr. Lewis's alleged conduct in possessing seven bullets in his home is conduct that the "Constitution presumptively protects." *Rahimi*, No. 21-11001 at 6. This Court should find that § 922 (g)(8) is facially unconstitutional because both disarming people subject to protective orders, and restricting the possession of bullets in one's home, are restrictions on Mr. Lewis's Second Amendment rights that are neither rooted in the text of the Second Amendment, nor supported by our nation's history of firearm regulation.

## Factual Background

On November 4, 2021, the City of Newburgh Police Department, with the assistance of the Federal Bureau of Investigation, executed a search warrant of Mr. Lewis's apartment and found approximately seven bullets in a plastic bag and quantities of substances alleged to be crack and heroin. Complaint, ECF. Doc. No. 1. According to the complaint, Mr. Lewis was interviewed by the FBI and stated that he lived in the apartment, that he found the ammunition while cleaning and kept it. *Id.* The FBI confirmed that Mr. Lewis was the subject of two active orders of protection. *Id.* The protective orders included boilerplate language that it was a federal crime to buy, possess or transfer firearms or ammunition. Mr. Lewis did not share the apartment with either protected party named in the orders of protection. Nor was it alleged that Mr. Lewis had been previously charged with, or pled guilty to, domestic violence conduct involving or using a weapon in the cases that resulted in the orders of protection. As a result of the FBI search, Mr. Lewis was charged federally with Possession of Ammunition by a Prohibited Person in violation of 18 U.S.C. § 922 (g)(8) and Possession with Intent to Distribute Narcotics in violation of 21 U.S.C. § 841 (a)(1) and (b)(1)(C). *Id.*

## Argument

The Fifth Circuit in *United States v. Rahimi* held that § 922 (g)(8) is facially unconstitutional. *Rahimi,* No. 21-11001 at 4. Rahimi was involved in five shootings in and around Arlington, Texas. *Id* at 2. After he was identified as a suspect by the Arlington Police Department, a search warrant was obtained, and his home was searched. *Id*. Police found a rifle and pistol in the home. *Id* at 3. Rahimi admitted to the police that he possessed the firearms and that he was the subject of an active protective order that stemmed from an alleged assault of his ex-girlfriend. *Id*. This protective order prohibited Rahimi from possessing a firearm and he was indicted federally and charged with violating 18 U.S.C. § 922 (g)(8). *Id*.

Rahimi moved to dismiss the indictment on the ground that § 922 (g)(8) was facially unconstitutional based on Supreme Court precedent pre-*Bruen*. *United States v. Rahimi*, Brief in Opposition to Gov't's Pet'n for a Writ of Certiorari, p. 8. The motion was denied by the district court and he pled guilty. *Id*. Rahimi appealed his conviction. *Id*. The Fifth Circuit first affirmed the district court, and then withdrew its opinion and ordered supplemental briefing following the *Bruen* decision. In withdrawing its prior opinion and vacating Rahimi's conviction, the Fifth Circuit held:

> Doubtless, 18 U.S.C. § 922 (g)(8) embodies salutary policy goals meant to protect vulnerable people in our society. Weighing those policy goals' merits through the

sort of means-end scrutiny our prior precedent indulged, we previously concluded that the societal benefits of § 922(g)(8) outweighed its burden on Rahimi's Second Amendment rights. *But Bruen forecloses any such analysis in favor of a historical analogical inquiry into the scope of the allowable burden on the Second Amendment right. Through that lens, we conclude that § 922(g)(8) 's ban on possession of firearms is an "outlier that our ancestors would never have accepted." Id. Therefore, the statute is unconstitutional, and Rahimi's conviction under that statute must be vacated.*

*Id* at 25. (Emphasis Supplied)

In applying this analysis to Mr. Lewis's case, the § 922 (g)(8) count of the indictment should be dismissed as facially unconstitutional. *Bruen* articulated an analytical approach to determine the constitutionality of the statute under the Second Amendment. The first step is to determine whether a restriction regulates conduct that falls within the scope of the Second Amendment. *Bruen*, 142 S. Ct. at 2129. If a restriction regulates conduct protected by the Second Amendment, the burden is on the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id* at 2130. In other words, the Government bears the burden of proving the constitutionality of its actions.

The Second Amendment refers to "the people." Within the Constitution, "the people" is a "term of art"—wherever it occurs, "the term unambiguously refers to all members of the political community, not an unspecified subset." *Heller*, 554 U.S. at 580–81 (emphasis added); accord *United States v. Verdugo–Urquidez*, 494 U.S. 259, 265 (1990) (The term "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community."). The Second Amendment right—no less than any other constitutional right—"belongs to all Americans." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (describing felons as "indisputably part of 'the people'" under the Second Amendment); *United States v. Meza-Rodriguez*, 798 F.3d 664 671 (7th Cir. 2015) (holding that a person's "criminal record" is irrelevant in determining whether the person is among "the people" protected under the Second Amendment, noting that the amendment "is not limited to such on-again, off-again protections"). There is no textual argument to the contrary. It is the text of the Amendment that "the people" of the United States ultimately ratified through their elected representatives and delegates. *United States v. Rahimi*, Brief in Opposition to Gov't's Pet'n for a Writ of Certiorari, p. 20. Accordingly, Mr. Lewis is one of "the people" subject to Second Amendment protections.

The Second Amendment, at its core, protects an individual's right to possess a firearm or ammunition in one's home for purposes of self-defense. *McDonald v. Chicago*, 561 U. S. 742, 767 ("Self-defense is a basic right, recognized by many legal systems from ancient times to the present day, and in Heller, we held that individual self-defense is 'the central component' of the Second Amendment right."). *Id.* Section 922 (g)(8), provides that:

> [I]t shall be unlawful for any person…who is subject to a court order that: (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate; (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and (C) (i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury...to possess in or affecting commerce, any firearm or ammunition.

18 U.S. Code § 922 (g)(8).

Section 922 (g)(8) criminalizing the possession of a single bullet by a protective order subject clearly burdens conduct that falls within the scope of the Second Amendment. If the protective order includes the requisite language, a respondent who simply possesses a bullet in their home faces up to ten or fifteen years in federal prison. The federal ban applies regardless of whether he keeps a bullet locked in his bedroom; whether he resides with the person protected by the order or lives in another home (or even another state); whether there were allegations of previous violence or misuse of bullets; and whether the order expressly forbade firearm possession. Any protective order specified in the statute disarms the protective-order subject under penalty of a federal felony for the duration of the order. Since there is no exception in § 922 (g)(8) for home-defense or self-defense, a protective-order subject is totally deprived of his right to bear arms. "[T]he right to self-defense … is at its zenith inside the home." See *Gould v. Morgan*, 907 F.3d 659, 672 (1st Cir. 2018).

Since Mr. Lewis's conduct is protected by the Second Amendment, the Government must justify § 922 (g)(8) as consistent with the Nation's historical tradition of firearm regulation. Such an analysis must fail as there is no indication or historical support that protective-order subjects would be members of a class subject to longstanding prohibitions on otherwise lawful ammunition ownership.[2]

---

[2] This lack of historical support also applies to domestic violence misdemeanants. David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (2017) ("[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."); Carolyn B. Ramsey, *Firearms in the Family*, 78 Ohio St. L.J. 1257, 1301 (2017) ("Historical support for the exclusion of domestic violence offenders from Second Amendment protection appears rather thin."); Keateon G. Hille, The *Second Amendment: From* Miller *to* Chovan*, and Why the* Marzzarella *Framework is the Best Shot Courts Have*, 50 Gonz. L. Rev. 377, 392 (2015) (acknowledging

The Government bears a heavy burden here—it "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2127. That burden is even heavier because § 922(g)(8) "addresses a general societal problem that has persisted since the 18th century," and yet no one attempted to disarm domestic abusers as a class during the first two centuries of our nation's existence. *Id.* at 2131.

The founding generation utilized a variety of tools to address intimate partner violence, but none of them resembled the complete disarmament contemplated by § 922 (g)(8). Five states recognized domestic violence as grounds for divorce. See, e.g., 1 *Laws of the Commonwealth of Massachusetts, from November 28, 1780 to February 28, 1807* at 301 (1807) (statute enacted Mar. 16, 1786) (". . . for the cause of extreme cruelty"); see also *Hill v. Hill*, 2 Mass. 150, 150 (1806) (equating "extreme cruelty" with "actual assault"). There were also criminal sanctions: "In colonial New England, domestic violence offenders might be brought before a magistrate, bound over, and sentenced to a variety of punishments that often included public shaming. Whipping, a fine, the stocks, or some combination of these penalties appear to have been the most common sentences for wife beaters." Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 Penn St. L. Rev. 337, 346 (2015). The penalty for intimate-partner homicide was death. *Id.* at 348. The Government cannot say that the founding generation was unaware of domestic violence as a societal problem. The Founders could have adopted a complete ban on firearms to combat intimate-partner violence. They did not.

Further, the Framers did not exclude people subject to protective orders from possessing bullets:

> It is true that the Framers and the public at large wanted gun owners to be virtuous and peaceable (except when fighting was necessary). This is one reason for the preference for militias over standing armies; because the professional soldier was entirely dependent on the government, and lived a life of constant obedience to others, it was believed that moral degradation would result. It is equally true that the Framers and the American people wanted virtuous people as voters, jurors, elected officials, and so on. But there is simply no tradition - from 1791 or 1866 - of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders. The colonies and then the states certainly knew how to ban firearms possession for people who were considered dangerous (namely, slaves and Indians). This "tradition" cannot be extended to every person whom a modern legislature might consider dangerous. A modern ban might be upheld under heightened scrutiny, but there is no tradition that persons subject to novel modern bans have been historically considered to have no Second Amendment rights at all.

---

that the "prohibition on firearms possession by domestic violence misdemeanants is not longstanding" and advocating for a means-ends test); Allen Rostron, *Justice Breyer's Triumph in the Third Battle Over the Second Amendment*, 80 Geo. Wash. L. Rev. 703, 741 (2012) ("If longstanding tradition is the key common characteristic of the items on the *Heller* list, modern legal innovations like the ban on guns for domestic violence misdemeanants, however much they may reduce risks and benefit society, do not qualify.").

David B. Kopel & Joseph G. S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis L.J. 193, 244 (Winter 2017).

Under a historical analogical approach, "analysis of whether … gun regulations are permissible must be based on their historical justifications." *Id.* (internal quotations omitted). Section 922(g)(8) is unconstitutional because there is no historical precedent, in the historical record or by analogy, for disarming individuals subject to protective orders. Section 922(g)(8) is a relatively recent statute that originated with three bills first introduced in 1993. Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. at 538-44. After a period of vigorous debate between political parties, policy groups, and special interests, it was signed into law on September 13, 1994. *Id.* There was nothing like it before in federal law.

Further, protective orders are a modern approach to addressing domestic violence. Although nearly every state and U.S. territory today has enacted a protective-order statute, there were no such statutes before 1970. Melvin Huang, *Keeping Stalkers at Bay in Texas*, 15 Tex. J. on C.L. & C.R. 53, 68 (Fall 2009) ("[P]rotective orders first came into existence in 1970 when the District of Columbia passed its Intrafamily Offenses Act. … Pennsylvania became the first state to authorize orders when it passed its Protection from Abuse Act in 1976. Within four short years, forty-five states implemented similar legislation."). There is no tradition of prohibiting gun or ammunition possession for people convicted of misdemeanors or subject to protective orders prior to 1994.

Under a historical-analogical framework, disarmament of subjects of protective-orders is unconstitutional because it is not supported by the text, history, or tradition of the Second Amendment. Thus, under *Bruen*'s analysis, and the above cited precedent, § 922 (g)(8) is facially unconstitutional and the count charging Mr. Lewis with allegedly possessing seven bullets in his home must be dismissed.

## **Conclusion**

Accordingly, Mr. Lewis moves this Court to dismiss Count one of the Indictment.

Respectfully submitted,

/s/

Yusuf El Ashmawy