```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  9/18/2023
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

        Plaintiff,

-against-

CALVIN LEWIS,

        Defendant.

No. 21 Cr. 789 (NSR)

ORDER & OPINION

NELSON S. ROMÁN, United States District Judge:

  Defendant Calvin Lewis ("Defendant" or "Lewis") is charged by a two-count indictment (the "Indictment") with possession of ammunition as a prohibited person in violation of Title 18 U.S.C. § 922(g)(8) ("§ 922(g)(8)") ("Count One") and possession with intent to distribute narcotics in violation of 18 U.S.C. §§ 841(a)(1) and (b)(1)(C) ("Count Two"). (*See* ECF Nos. 1 and 5.) Lewis now moves to dismiss Count One of the Indictment, purely on the basis that § 922(g)(8) is a facially unconstitutional restriction on a person's right to bear arms in violation of the Second Amendment. (ECF No. 30, "the Motion".). For the following reasons, Lewis' Motion is DENIED.

## BACKGROUND

  Lewis was arrested on November 4, 2021 and charged by the Indictment with Counts One and Two, described *supra*. (*See* ECF No. 1.) On December 21, 2021, a Grand Jury returned the Indictment. (ECF No. 5.) Subsequently, on June 12, 2023, Defendant filed the instant Motion to Dismiss Count One, which charges Defendant with possession of ammunition knowing he was subject to a court protective order issued on September 23, 2021 (the "Protective Order'). (ECF No. 30.) On July 26, 2023, the Government opposed Lewis' Motion. (ECF No. 33, Opposition ("Opp.").) And, on August 17, 2023, Lewis replied to the Government's Opposition. (ECF 34, Reply ("Repl.").)

> I.  **Search of Lewis' Premises**

On November 4, 2021, the City of Newburgh Police Department ("CNPD"), alongside the Federal Bureau of Investigation ("FBI"), executed a New York State search warrant (the "Warrant") on Defendant's residence, a first-floor apartment on South Clark Street in the City of Newburgh, New York (the "Apartment"). (ECF No. 1, at 2.) The Warrant was based on three purchases of fentanyl and heroin from Defendant by a CNPD confidential informant (the "CI"), and it authorized a search of the Apartment for evidence of narcotics distribution. (*Id.*, at 2-3.)

Law enforcement entered the Apartment and identified Defendant in the living room area, where they noticed in plain view on a windowsill a clear plastic bag containing seven live rounds of ammunition (the "Ammunition"). (*Id.*, at 3.) Law enforcement discovered medical discharge paperwork in Defendant's name next to the ammunition and, also in plain view, a plastic sandwich bag containing crack cocaine and sixty (60) glassine envelopes containing heroin and fentanyl. (*Id.*)

Based on these observations, law enforcement arrested Defendant and then conducted a video recorded interview of him at the FBI's offices in New Windsor, New York. (*Id.*) Defendant offered the following admissions during this interview: (1) he lived in the living room of the Apartment where the ammunition, heroin, and fentanyl were discovered; (2) he treated the Apartment as his bedroom; (3) he found the ammunition while cleaning the Apartment and intended to hold onto it until he located someone with the appropriate caliber handgun for the Ammunition; (4) he believed the crack cocaine, heroin, and fentanyl belonged to him; (5) he was subject to a protective order issued around April 2021; and (6) he believed there was an outstanding warrant for his arrest. (*Id.*, at 4.)

> II.  **The Protective Order**

Defendant Lewis was subject to the Protective Order while in possession of the seven live rounds of ammunition described *supra*. (ECF No. 1, at 4.) The Newburgh City Court issued the Protective Order on September 23, 2021, after providing Defendant with notice and an opportunity for a hearing.[1] (*Id.*, at 1.) The Protective Order was granted to Victim-1, who is the mother of one of Defendant's children, and it was valid for two years, until September 22, 2023. (*Id.*, at 4-5.) Specifically, the Protective Order restrains Defendant from assaulting, threatening, abusing, harassing, menacing, strangling, intimidating, or stalking Victim-1. (*Id.*) The Protective Order also prohibits Defendant from possessing or purchasing firearms or ammunition. (*Id.*, at 5.)

Separately, the City of Newburgh court issued an earlier protective order (the "Earlier Order") against Defendant on November 12, 2019, which was active through November 12, 2021 and contained identical warnings and prohibitions to the Protective Order, against a different victim, Victim-2. (ECF No. 1, at 5.) Victim 2 is likewise a parent of one of Defendant's children. (*Id.*) Additionally, the Earlier Order was, in the same manner as the Protective Order, served personally on Defendant in court and bears his signature. (*Id.*)

### III.    § 922(g)(8)

The federal Gun Control Act of 1968 prohibits individuals who fall into several categories, including convicted felons and fugitives, from firearms possession. *See* § 922(g)(1)–(4). Congress amended this statute in 1994 to introduce a new category, § 922(g)(8), covering individuals subject to certain domestic violence protection orders ("DVPO"). Violent Crime Control and Law Enforcement Act, Pub. L. No. 103-322, § 110401(c), 108 Stat. 1796, 2014–15.

Section 922(g)(8) applies if three conditions exist:

(1) a court issues an order after the individual receives notice and an opportunity to

---

[1] The Protective Order was personally served on Defendant in court and bears his signature. (ECF No. 1, at 5.)

be heard;

(2) the order restrains the individual from "harassing, stalking, or threatening an intimate partner or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child"; and

(3) the order "includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child" or "explicitly prohibits the use, attempted use, or threatened use of physical force ... that would reasonably be expected to cause bodily injury."

18 U.S.C. § 922(g)(8). A person subject to an order that meets these criteria may not possess a firearm.

## LEGAL STANDARD

### I. Analysis for Second Amendment Claims Post-*Bruen*

On June 23, 2022, the U.S. Supreme Court promulgated a novel standard of review for federal courts to use when evaluating whether a regulation violates the Second Amendment. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126, 213 L. Ed. 2d 387 (2022). The Supreme Court found that the second step in the previous approach was inconsistent with the principles articulated in *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) and *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), and thereby established the following, new approach consistent with *Heller*: (1) "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct"; and (2) "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation."

*Bruen*, 142 S. Ct. at 2129–30.

As part of that second step, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127. The "historical inquiry ... will often involve reasoning by analogy ..." *Bruen*, 142 S. Ct. at 2132. Such "analogical reasoning requires only that the government identify a well-established and representative historical analogue, not a historical twin, so even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* at 2133.

To "enabl[e] [courts] to assess which similarities are important and which are not" during this analogical inquiry, the Court instructed courts to use "two metrics," which are "central" considerations to that inquiry: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. Said differently, courts must consider: (1) "whether modern and historical regulations impose a comparable burden on the right of armed self-defense"; and (2) "whether that [regulatory] burden is comparably justified." *Id.* at 2133.

Additionally, when courts review historical sources, those that arose around when the Second Amendment was adopted (1791) and when the Fourteen Amendment was adopted (1868) are particularly instructive, whereas laws that predated the adoption of the Constitution or long post-dated the enactment of the Fourteenth Amendment are given less weight:

> "We categorize these historical sources because, when it comes to interpreting the Constitution, not all history is created equal. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them. The Second Amendment was adopted in 1791; the Fourteenth in 1868. Historical evidence that long predates either date may not illuminate the scope of the right if

> linguistic or legal conventions changed in the intervening years. It is one thing for courts to reac[h] back to the 14th century for English practices that prevailed up to the period immediately before and after the framing of the Constitution. It is quite another to rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."

*Bruen*, 142 S. Ct. at 2136 (internal quotations and citations omitted).

> "Similarly, we must also guard against giving post-enactment history more weight than it can rightly bear." It is true that in Heller we reiterated that evidence of how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century represented a critical tool of constitutional interpretation. We therefore examined "a variety of legal and other sources to determine the public understanding of [the Second Amendment] after its ... ratification. And, in other contexts, we have explained that a regular course of practice' can 'liquidate & settle the meaning of disputed or indeterminate 'terms & phrases in the Constitution."

*Id.* at 2136 (internal quotations and citations omitted) (emphasis in original).

Significantly, however, "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 142 S. Ct. at 2132. This language highlights the Supreme Court's recognition that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868" even though "the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." *Id.*

## DISCUSSION

Lewis argues that § 922(g)(8) is facially unconstitutional[2] because: (1) "the people" whom the Second Amendment protects includes individuals subject to certain DVPOs; and (2) the prohibitions of § 922(g)(8) are inconsistent with the Nation's historical tradition of firearms regulation, which Lewis contends does not include analogous prohibitions. (*See generally* Motion; Repl.) The Government counters that Defendant is mistaken on each point. (*See generally* Opp.)

### I. Individuals subject to § 922(g)(8) are within the scope of "the people" whom the Second Amendment protects.

As indicated *supra*, the first *Bruen* inquiry is whether the Second Amendment's "plain text covers an individual's conduct." 142 S. Ct. at 2126. The Amendment states: "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

Thus, as an initial matter, the Court must consider whether the plain text of the Second Amendment protects individuals subject to § 922(g)(8) (i.e., individuals who possess a firearm and/or ammunition and are subject to DVPOs). Lewis argues that such individuals are included within the scope of "the people" whom the Second Amendment protects because: (1) there is no textual support in the Second Amendment for the proposition that the Second Amendment does not protect individuals subject to DVPOs; and (2) the nation's founders rejected proposals limiting firearms protections to subsets of American citizens "in favor of an unqualified right belonging to all of 'the people.'" (Repl., at 4-7.) The Government, however, argues that individuals subject to § 922(g)(8) are not within the scope of "the people" whom the Second Amendment protects, since: (1) the "the people" refers to "law-abiding citizens"; and (2) § 922(g)(8) does not burden the rights

---

[2] To succeed on a facial challenge, "the challenger must establish that no set of circumstances exists under which [§ 922(g)(8)] would be valid*." United States v. Salerno*, 481 U.S. 739, 745 (1987).

7

of law-abiding citizens. (Opp., at 15-19.)

The Court agrees with Lewis that the Second Amendment protects individuals subject to § 922(g)(8). Indeed, the weight of precedent both before and after the Supreme Court decided *Bruen* indicates that Lewis, and other individuals subject to § 922(g)(8), are within the scope "the people" whom the Second Amendment shields. Even pre-*Bruen* (though post-*Heller*), for instance, another court in this district determined that the Second Amendment applies to such individuals, noting,

> "Circuit law instructs the Court to assume that a litigant is protected by the Second Amendment—and not to wade into the difficult task of defining precisely who does or does not qualify for the Second Amendment's protections unless a statute would fail the relevant level of scrutiny."

*United States v. Witcher*, No. 20-CR-116 (KMW), 2021 WL 5868172, at *4 (S.D.N.Y. Dec. 10, 2021); *see United States v. Jimenez*, 895 F.3d 228, 234 (2d Cir. 2018) ("we have routinely assumed that the Second Amendment applies to a given application of a firearms (or ammunition) regulation in order to determine whether the law being challenged would withstand the requisite level of scrutiny"). Post-*Bruen*, moreover, the overwhelming majority of courts have determined that the Second Amendment protects individuals subject to § 922(g)(8), including courts that have upheld the constitutionality of § 922(g)(8). *See United States v. Silvers*, No. 5:18-CR-50-BJB, 2023 WL 3232605, at *6 (W.D. Ky. May 3, 2023) ("Many courts analyzing § 922(g)(8) in the wake of *Bruen* have rejected the Government's theory" that "individuals subject to a domestic-violence order (or any historical analogue) automatically fall outside the scope of the Second Amendment"); *see also United States v. Rahimi*, 61 F.4th 443, 453 (5th Cir.), cert. granted, 143 S. Ct. 2688 (2023) ("the Supreme Court has made clear that the Second Amendment right is exercised individually and belongs to all Americans) (citing *Heller*, 554 U.S. at 581, 128 S.Ct. 2783); *United States v. Perez-*

*Gallan*, 640 F. Supp. 3d 697, 701 (W.D. Tex. 2022), aff'd, No. 22-51019, 2023 WL 4932111 (5th Cir. Aug. 2, 2023) ("*Bruen's* first step asks a strictly textual question with only one answer: the Second Amendment's plain text covers possession of a firearm."); *United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824, at *6 (E.D. Cal. Mar. 29, 2023). Moreover, courts have typically held that the Second Amendment protects individuals subject to other, similar statutes that likewise restrict firearms possession within the home. *See United States v. Rowson*, No. 22 CR. 310 (PAE), 2023 WL 431037, at *15 (S.D.N.Y. Jan. 26, 2023) (collecting cases).

This precedential guidance is unsurprising. The *Bruen* Court focused on the question of whether the Second Amendment's "plain text covers an individual's conduct" subject to a regulation, rather than the status or characteristics of that individual. 142 S. Ct. at 2126 (emphasis added); *see Rowson*, 2023 WL 431037, at *15 (recognizing this distinction between "conduct" and "status or characteristics."); *see also Silvers*, 2023 WL 3232605, at *6 (likewise noting that, "the *Bruen* Court focused on whether the Amendment's "plain text covers an individual's conduct" subject to regulation"); *Guthery*, 2023 WL 2696824, at *6 ("[T]he Court in *Bruen* articulates its holding with reference to conduct: 'we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.' Section 922(g)(8) prohibits individuals subject to a restraining order from engaging in the conduct of possessing firearms and ammunition for any purpose, including self-defense. It thus regulates conduct presumptively protected by the Second Amendment."). And, significantly, the *Bruen* Court concluded that the conduct that the regulation at issue restricted, firearms possession, is presumptively protected. 142 S. Ct. at 2130.

As the *Bruen* Court established that the conduct that § 922(g)(8) prohibits—possessing a firearm—is presumptively protected, the Court concludes that individuals subject to § 922(g)(8)

are within the scope of "the people" that the Second Amendment protects. 142 S. Ct. at 2130. Accordingly, the Court now must now determine whether § 922(g)(8) is justified based on "the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2130

## II. Although individuals subject to § 922(g)(8) receive the Second Amendment's protections, § 922(g)(8) is consistent with the historical tradition of firearms regulation.

The Government contends that § 922(g)(8) is consistent with the Nation's historical tradition of firearms regulation because it is analogous to two types of historical laws: (1) those disarming individuals considered lawless and irresponsible; and (2) surety laws that limited firearms possession based on a credible threat of harm. (Opp., at 19.) Lewis disagrees— he argues that § 922(g)(8) is inconsistent with this tradition because there is no trace in American history of laws disarming individuals to prevent "private violence" against "intimate partners." (Repl., at 9.)

The Government is correct that the English and American legal traditions are replete with laws that disarmed individuals deemed lawless as well as restricted firearms possession in circumstances where an individual posed a threat of harm. In the English tradition, for instance, the right to keep and bear arms was limited to peaceable citizens— officers of the Crown could "seize all arms in the custody or possession of any person" whom they "judge[d] dangerous to the Peace of the Kingdom.'" Militia Act of 1662, 13 & 14 Car. 2, c.3, § 13 (1662). Similarly, "going-armed" laws in early American history allowed for the seizure of guns from, and imprisonment of, people who went "armed Offensively" with "intentions" of "[v]iolence" or to "[d]isturb" the "[p]eace." 1 Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay, 52–53 (1869) (1692 statute); 1 HAWKINS, PLEAS OF THE CROWN 136. "Colonial Massachusetts and New Hampshire," for instance, "authorized justices of the peace to arrest 'all Affrayers,

Rioters, Disturbers, or Breakers of the Peace, and such as shall ride or go armed Offensively ... by Night or by Day, in Fear or Affray of Their Majesties Liege People.'" *Bruen*, at 2142–43 (ellipsis in original) (quoting 1692 Mass. Acts and Laws no. 6, pp. 11–12). Such "going armed" laws "codified [the] existing common-law offense of bearing arms to terrorize the people" recognized in 17th-century English caselaw and "were modeled after England's Statute of Northampton," which treatise writers understood to apply to a person who displayed an "'intention to commit a[n] Act of Violence or Disturbance of the Peace.'" *Bruen*, 142 S. Ct. at 2142–43 (quoting 1 WILLIAM HAWKINS, PLEAS OF THE CROWN 136 (1716)).

Surety statutes served as another historical method of restricting firearms possession in circumstances where an individual posed a danger to the community. Specifically, they required certain people, including "those threatening to do harm," to post a "surety" "before carrying weapons in public"; when "an individual's carrying of arms," was "attended with circumstances giving just reason to fear that he purposes to make an unlawful use of them," there existed "sufficient cause to require him to give surety of the peace." *Bruen*, 142 S. Ct. at 2148 (quoting WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 126 (2d ed. 1829)). And "[i]f he refused [to give surety] he would be liable to imprisonment." RAWLE, A VIEW OF THE CONSTITUTION 126. Although this practice originated in the common law, state governments later codified it after the ratification of the Bill of Rights. *See* 4 BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 252; *Bruen*, 142 S. Ct. at 2148 & n.23 (identifying jurisdictions that enacted surety statutes following ratification).[3]

---

[3] Historical restrictions on firearms use extended to ammunition, as the Government describes. *See* 7 Records of the Colony of Rhode Island and Providence Plantations in New England 567 (1862) (requiring seizure of "all arms, ammunition and warlike stores" from persons refusing to take loyalty oath); Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776, at 90 (1777) (authorizing seizure from persons

Notwithstanding this lengthy tradition of firearms regulation, Lewis is correct that there is no historical evidence of English or American laws that disarmed individuals to prevent "private violence" against "intimate partners." The Government does not argue that such a tradition exists, and the Court has not discovered one. The central point of disagreement, then, concerns the degree of consistency required under *Bruen* between § 922(g)(8) and the aforementioned laws regulating firearms possession for the Court to uphold the constitutionality of this statute. In other words, is it sufficient under *Bruen* that there is evidence in American history of laws disarming individuals deemed dangerous, or must there also exist evidence of laws that are more precisely analogous to § 922(g)(8), such as a statute that disarms certain individuals to prevent domestic violence? As discussed *infra*, the Court concludes that *Bruen* necessitates the degree of consistency the Government articulates— that § 922(g)(8) is part of this Nation's practice of disarming dangerous, lawless individuals.

To determine whether a particular law is consistent with our tradition of firearms regulation, *Bruen* instructs courts to consider "how and why the regulation[] burden[s] a law-abiding citizen's right to armed self-defense." *Bruen*, 142 S. Ct. at 2132–33. With respect to "how" § 922(g)(8) burdens an individual's Second Amendment rights, the historical laws and regulations discussed *supra* permitted the Government to disarm certain individuals based on concerns over their threat to community safety in the same manner as § 922(g)(8)— they prohibited a person from possessing weapons (and, in some cases, ammunition) in circumstances where that person posed a danger to the community. Regarding "why" 922(g)(8) burdens an individual's Second Amendment rights, the aforementioned historical regulations permitted the disarmament of

---

judged "di[s]affected and dangerous" of "all the Arms, Accoutrements and Ammunition which they own or po[ss]e[s]s"); Act of Apr. 1, 1778, ch. LXI, § 5, 1777-1778 P.A. Laws 123, 126 (prohibiting any person refusing to take loyalty oath to "keep any arms or ammunition in his house or elsewhere").

individuals precisely because they were considered a danger to the community. § 922(g)(8) similarly empowers the government to disarm individuals who are subject to certain court orders that are intended to protect the community, such as DVPOs, ostensibly due to the heightened risk that such individuals pose when they are armed. *United States v. Guthery*, No. 2:22-CR-00173-KJM, 2023 WL 2696824, at *8 (E.D. Cal. Mar. 29, 2023) (noting that Section 922(g)(8) satisfies *Bruen's* "why" criterion because it "prohibits those who are subject to domestic violence restraining orders—those who, in the government's judgment, threaten the safety of others—from possessing firearms and ammunition" for similar reasons to "historical laws and regulations [that] regulated the conduct of those deemed to be a danger to public safety and allowed their dispossession of firearms"); *see also United States v. Nutter*, 624 F. Supp. 3d 636, 641 (S.D.W. Va. 2022) (concluding that § 922(g)(9) was constitutional post-*Bruen* partly because surety laws "establish that domestic violence was a concern in the founding era, and that laws designed to restrict the rights of those who committed such abuse, and protect the victims, were not viewed as controversial").

As there are clear regulatory analogues to "how" and "why" § 922(g)(8) burdens an individual's Second Amendment rights, the absence of an exact historical match for this statute does not render it unconstitutional. The *Bruen* Court stressed that its directive for courts to search for historical analogues is not intended to bind the Court in a "regulatory straitjacket." *Bruen*, 142 S. Ct., at 2133. It also emphasized that "[e]ven if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous to pass constitutional muster." *Id.* Therefore, the investigation for historical consistency "requires only that the government identify a well-established and representative historical *analogue*, not a historical *twin*," which the Government has accomplished here with respect to § 922(g)(8). *Id.*

This accommodative approach to historical consistency is logical. As another court recognized in upholding the constitutionality of § 922(g)(8) post-*Bruen*, "the absence of stronger [historical analogues] may reflect the fact that the group most impacted by domestic violence lacked access to political institutions, rather than a considered judgment about the importance or seriousness of the issue." *United States v. Nutter,* 624 F. Supp. 3d 636, 641 (S.D.W. Va. 2022). Or, as one other court asked,

> "[D]oes [the absence of specific laws disarming someone accused or convicted of domestic violence] actually reflect historical attitudes regarding firearm regulation, or is it instead a feature of historical attitudes regarding the role of the state in policing violence between intimate partners? And if the change is in how we think of domestic violence, not in how we think of firearms *per se*, does the Second Amendment require us to nevertheless stick by those old norms because they happen to be relevant to firearm regulation?"

*United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at *4 (M.D. Tenn. Nov. 16, 2022). Indeed, although *Bruen* requires that a regulation restricting Second Amendment rights is consistent with the Nation's historical tradition of firearms regulation, it does not empower courts to strike down a statute purely because our Nation neglected to pass a nearly identical law in past centuries. The ethical concerns of our society evolve over time, and *Bruen's* framework permits this progress.

Thus, Defendant's facial challenge to Section 922(g)(8) fails due to this statute's secure position within our Nation's tradition of disarming dangerous, lawless individuals. Defendant's Motion to Dismiss Count One of the Indictment on the basis that Section 922(g)(8) is facially unconstitutional is, therefore, DENIED.

## CONCLUSION

For the foregoing reasons, Defendant Lewis' Motion to Dismiss Count One of the Indictment is DENIED. The Clerk of the Court is kindly directed to terminate the motion at ECF Nos. 30 and 34.

Dated: September 18, 2023
      White Plains, NY

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE